*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BASEM KOMIS,

        Plaintiff/Counterdefendant,

v

KIMBERLY R. BASEHART-GAETANO, TOP
DOLLAR HOLDINGS, LLC, doing business as 420
DANK OF MICHIGAN, LLC, and STAR-TEK
HOLDINGS, LLC,

        Defendants/Counterplaintiffs/Cross-
        Plaintiffs/Third-Party Plaintiffs-
        Appellants,

and

RICHARD GAETANO, JAMINE DICKENS, and
420 DANK OF MICHIGAN, LLC,

        Defendants,

and

420 DANK, LLC,

        Defendant/Cross-Defendant,

and

JALAL BAYDOUN,

        Third-Party Defendant,

and

UNPUBLISHED
March 4, 2021

No. 351287
Wayne Circuit Court
LC No. 17-012714-CB

-1-

GREGORY A. GOODMAN,

Third-Party Defendant-Appellee.

---

Before: MURRAY, C.J., and JANSEN and STEPHENS, JJ.

PER CURIAM.

Kimberly R. Basehart-Gaetano (Gaetano), Top Dollar Holdings, LLC, doing business as 420 Dank of Michigan, LLC (Top Dollar), and Star-Tek Holdings, LLC (Star-Tek) (collectively, defendants[1]), appeal as of right a final order denying their motion for summary disposition and granting the competing dispositive motion filed by third-party defendant, Gregory A. Goodman. We agree that Goodman was not entitled to summary disposition and therefore reverse the court's summary disposition order with respect to Goodman's motion, but affirm the trial court's denial of defendants' motion for summary disposition, albeit on different grounds.

Defendants also argue on appeal that the trial court repeatedly abused its discretion with respect to discovery matters. We decline to address any arguments involving discovery relevant only to the claims between defendants and plaintiff, Basem Komis, because those issues were rendered moot by these parties' settlement and dismissal of the claims against one another. However, of defendants' remaining discovery challenges, we agree that some of the documents defendants sought to compel from Goodman were relevant to the claims pending in this case and were subject to discovery. The trial court abused its discretion by ruling otherwise. We vacate the trial court's orders regarding defendants' motion to compel production of documents from Goodman, and remand with instructions to permit discovery of relevant, nonprivileged material consistent with this opinion. Defendants' other discovery arguments are either moot or without merit and do not require appellate relief.

Defendants also argue on appeal that the trial court abused its contempt powers by placing Gaetano in custody without minimum due process. In a closely related issue, defendants challenge the denial of their motion for disqualification of the presiding judge. We agree that the contempt proceedings did not comport with the requirements of due process and that the totality of the circumstances stemming from the contempt proceeding warranted disqualification of the presiding judge. We emphasize, however, that disqualification is necessary under MCR 2.003(C)(1)(b)(ii) because of an objective appearance of impropriety, rather than any actual bias against defendants. On remand, this case should be assigned to a new judge for further proceedings.

## I. FACTUAL BACKGROUND

Gaetano has been involved in the medical marijuana industry for several years, engaging in business in a number of states through a variety of limited liability companies, sometimes with

---

[1] The remaining defendants are not participating in this appeal and will be referred to by name. Our use of the term defendants refers only to Gaetano, Top Dollar, and Star-Tek.

the participation of her husband, defendant Richard Gaetano (Richard). Goodman was formerly a licensed attorney in Colorado and represented Gaetano in connection with her medical marijuana endeavors until he was disbarred following an investigation relating to this representation. There is a great deal of hostility and ill will between these parties and they have previously litigated against each other, most notably in a Washington action that resulted in a sizable judgment in favor of Goodman. Goodman registered the Washington judgment with the Macomb Circuit Court in March 2017 in order to enforce it in Michigan.

The underlying lawsuit in this case stems from a dispute between Komis and defendants arising from their plans to create a new company together for the purpose of participating in Michigan's then-new medical marijuana industry. In a joint venture agreement between Komis and Gaetano, Gaetano represented that she was the sole member of several entitles, including an Oregon entity, defendant/cross-defendant, 420 Dank LLC (Oregon Dank). Oregon Dank purportedly held title to a property on Gratiot Avenue in Detroit, and Gaetano agreed to assign Oregon Dank's interest in this property to the new company for use as a dispensary. Komis likewise agreed to make certain contributions, including financial investments. They mutually agreed to act as comanagers with equal voting rights, though Gaetano would own a majority (62.5%) of the new company. It is undisputed that Komis invested several hundred thousand dollars in the venture, but the new company was never formed. Gaetano, however, still acquired licensing and opened a medical marijuana dispensary on the Gratiot property without Komis's participation, prompting Komis to file suit against Gaetano, Top Dollar (the operator of the dispensary), and Star-Tek (the purported owner of the Gratiot property).

The record suggests that in approximately March 2017, Komis and Goodman first came in contact. Around the same time, it came to light that Gaetano sold Oregon Dank months before she entered the joint venture agreement with Komis. But according to an assignment recorded in April 2017, Oregon Dank had previously assigned its interest in the Gratiot property to Star-Tek in February 2015. In June 2017, however, the managing member of the now dissolved Oregon Dank executed a quitclaim deed for the Gratiot property in favor of Komis. The quitclaim deed was recorded in July 2017. Notably, Goodman wrote a letter to defense counsel in May 2017 regarding enforcement of the Washington judgment against Gaetano and Richard. In the letter he claimed that he "assisted Mr. Komis in getting clean title to the building on Gratiot Ave., by brokering a deal among him, I and the [Oregon Dank] people . . . ."

Consequently, when defendants filed counterclaims against Komis, they also added Goodman as a third-party defendant to the action. In pertinent part, defendants' complaint presented a claim of tortious interference with a business relationship or expectancy (tortious interference) alleging that Goodman was engaged in an ongoing campaign of retaliation after his disbarment and, together with Komis, harassed the purchasers of Oregon Dank to convey a fraudulent quitclaim deed to Komis. Defendants further alleged that Goodman, Komis, and third-party defendant Jalal Baydoun (whom they believed was the true source of Komis's investment funds) engaged in a variety of other unethical and unlawful behavior for the purpose of interfering with the business relationships and expectancies between defendants and their business contacts and customers. Defendants also pleaded a claim for slander of title concerning the Gratiot property.

-3-

The discovery process in this case was tumultuous, highly contentious, and largely ineffective. The majority of the disputes were between Komis and defendants, as Goodman did not begin actively participating in the case until mid-2018. By December 2018, Komis and defendants reached a settlement, and the trial court entered a stipulated order dismissing the claims between them. In May 2019, defendants moved for summary disposition under MCR 2.116(C)(10), arguing that they were entitled to judgment as a matter of law on both of their claims against Goodman. Goodman moved for summary disposition under MCR 2.116(C)(7) and (8), arguing that defendants' claims were precluded by the doctrine of res judicata, that defendants could not support their claims, and that their "third-party clams" against him should be dismissed because they were not proper third-party claims arising from derivative liability for Komis's claims against defendants. The trial court denied defendants' dispositive motion and granted Goodman's dispositive motion. This appeal followed.

## II. SUMMARY DISPOSITION

## A. GOODMAN'S MOTION FOR SUMMARY DISPOSITION

We will first address defendants' contention that the trial court erred by granting Goodman's summary disposition. Defendants argue that Goodman's motion should have been stricken because it was not timely filed, that the trial court erred by granting Goodman's motion on the basis of res judicata, and that mistaken identification of Goodman as a third-party defendant did not warrant summary disposition. We agree in part and disagree in part.

We review summary disposition rulings de novo. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). Although the trial court cited only MCR 2.116(C)(10) in its order, MCR 2.116(C)(7) is implicated when a claim is barred by res judicata.[2] *Allen Park Retirees Ass'n, Inc v Allen Park*, 329 Mich App 430, 443; 942 NW2d 618 (2019). A trial court considering a motion under MCR 2.116(C)(7) "must accept as true the allegations of the complaint unless contradicted by the parties' documentary submissions." *Allstate Insurance Co v State Farm Mut Auto Ins Co*, 321 Mich App 543, 550-551; 909 NW2d 495 (2017). "Although not required to do so, a party moving for summary disposition under Subrule (C)(7) may support the motion with affidavits, depositions, admissions, or other admissible documentary evidence, which the reviewing court must consider." *Id*. at 551. Whether res judicata applies to bar a claim is a question of law and, therefore, reviewed de novo. *Allen Park Retirees Ass'n*, 329 Mich App at 443.

A dispositive motion under MCR 2.116(C)(8) tests the legal sufficiency of a claim and should be granted "when a claim is so clearly unenforceable that no factual development could possibly justify recovery." *El-Khalil*, 504 Mich at 159-160. "When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone." *Id*. at 160.

---

[2] "[W]here a court's opinion does not invoke the proper court rule supporting its ruling, we may look to the substance of the holding to determine which rule governs." *Williamstown Twp v Hudson*, 311 Mich App 276, 288; 874 NW2d 419 (2015).

We review a trial court's decision regarding enforcement of scheduling orders for an abuse of discretion. *Kemerko Clawson, LLC v RXIV Inc*, 269 Mich App 347, 349; 711 NW2d 801 (2005). "A trial court abuses its discretion when it chooses an outcome that falls outside the range of reasonable and principled outcomes." *Cove Creek Condo Ass'n v Vistal Land & Home Dev, LLC*, 330 Mich App 679, 707; 950 NW2d 502 (2019) (quotation marks and citation omitted).

Defendants first argue that the trial court should not have addressed the merits of Goodman's motion and, instead, should have stricken it from the record because it was untimely. We disagree. The trial court entered an order requiring all motions for summary disposition to be filed by May 29, 2019. Goodman's motion was time-stamped May 30, 2019, at 12:28 a.m. When defendants raised the untimeliness of the motion before the trial court, the court responded, "I don't care about that."

Trial courts have broad discretion to manage their dockets and are free to reject untimely motions. *Kemerko Clawson*, 269 Mich App at 349-350. The existence of such discretion implicitly affords the court equal freedom to consider a motion filed beyond a court-ordered deadline. Defendants maintain that it was an abuse of discretion to consider the motion because Goodman's late filing "was yet another intentional disregard for the trial court's orders and a distraction from the issues of Summary Disposition in favor of the [defendants]." We find this rationale unpersuasive. Goodman missed the filing deadline by less than half an hour, and the 28-minute delay did not disturb the court's ability to effectively consider the competing motions without undue burden to the court or defendants. The mere fact that the trial court ultimately found merit in Goodman's dispositive motion does not remove its decision to consider the motion from the range of reasonable and principled outcomes.

Defendants also argue that Goodman's motion should have been denied because he did not raise res judicata in his answer to their complaint. We agree. "The preclusion doctrines of res judicata and collateral estoppel serve an important function in resolving disputes by imposing a state of finality to litigation where the same parties have previously had a full and fair opportunity to adjudicate their claims." *Allen Park Retirees Ass'n*, 329 Mich App at 444 (quotation marks and citation omitted). "Res judicata applies if (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *William Beaumont Hosp v Wass*, 315 Mich App 392, 398; 889 NW2d 745 (2016) (quotation marks and citation omitted).

Res judicata is an affirmative defense. *E & G Fin Co v Simms*, 362 Mich 592, 596; 107 NW2d 911 (1961). MCR 2.111(F)(3) requires that affirmative defenses "be stated in a party's responsive pleading, either as originally filed or as amended in accordance with MCR 2.118." *Glasker-Davis v Auvenshine*, ___ Mich App ___, ____; ___ NW2d ___ (2020) (Docket No. 345238); slip op at 5, quoting MCR 2.111(F)(3) (quotation marks omitted; emphasis omitted). Generally, "failure to raise an affirmative defense as required by the court rule constitutes a waiver of that affirmative defense." *Dell v Citizens Ins Co of America*, 312 Mich App 734, 752; 880 NW2d 280 (2015) (quotation marks and citation omitted). As such, when an affirmative defense is not raised in a responsive pleading, a trial court cannot properly grant summary disposition on the basis of the affirmative defense. *Baker v Marshall*, 323 Mich App 590, 598; 919 NW2d 407 (2018).

Res judicata was not among the several affirmative defenses raised in Goodman's answer to defendants' complaint. Although this Court has found exceptions to the general waiver of an untimely affirmative defense, none of those exceptions appear applicable in this case. See, e.g., *Fraser Twp v Haney (On Remand)*, 331 Mich App 96, 99; 951 NW2d 97 (2020) (responding to the merits of affirmative defense without objection allows consideration of affirmative defense by express or implied consent), lv gtd 950 NW2d 748 (2020); *Ostroth v Warren Regency, GP, LLC*, 263 Mich App 1; 687 NW2d 309 (2004) (affirming trial court's allowance of amendment to assert new affirmative defense); *Meridian Mut Ins Co v Mason-Dixon Lines, Inc*, 242 Mich App 645, 647-648; 620 NW2d 310 (2000) (permitting late reliance on an affirmative defense when the defendant moved for summary disposition immediately upon discovering the factual predicate for the defense). Consequently, we conclude that the trial court erred by granting Goodman's motion for summary disposition on the basis of an affirmative defense that was not raised in his responsive pleading or an amendment to that pleading. *Baker*, 323 Mich App at 598.

Moreover, even if Goodman had raised res judicata in his responsive pleading or sought leave to amend for the purpose of doing so, the trial court erred by accepting Goodman's res judicata defense on the existing record. The burden of proving the applicability of res judicata is on the party asserting it as a defense. *E & G Fin Co*, 362 Mich at 596-597. Goodman supported his motion for summary disposition with only four documents from the Washington case: a register of actions; Gaetano and Richard's answer, affirmative defenses, and counterclaims; an order with findings; and the judgment. The register of actions is just a listing of the documents filed and hearings held in the Washington lawsuit; it sheds no light on the nature of the claims litigated. All that can be gleaned from Gaetano and Richard's responsive pleading is that Goodman's complaint seemingly involved an unsuccessful business venture, and that Gaetano and Richard claimed immunity under a Washington statute that provides immunity from civil liability for claims stemming from communication to certain governmental agencies or organizations "regarding any matter reasonably of concern to that agency or organization." Wash Rev Code 4.24.510 (2002). The Washington court's December 9, 2016 order and findings demonstrate that after Gaetano and Richard did not comply with an order to appear for depositions, the court found they "acted in bad faith to stall and delay discovery," thereby prejudicing Goodman's ability to prepare for trial. The Washington court therefore dismissed Gaetano and Richard's counterclaims and entered judgment by default against them. The judgment itself only identifies the judgment creditor and debtors and the amount of the judgment. This scant evidence before the trial court was insufficient to determine the nature of the issues litigated in the Washington case, leaving the court without grounds to conclude that defendants' claims in this case were, or could have been, resolved in the parties' earlier litigation. *William Beaumont Hosp*, 315 Mich App at 398 ("Res judicata applies if . . . the matter in the second case was, or could have been, resolved in the first.") (quotation marks and citation omitted).

The trial court also agreed with Goodman's contention that the claims against him were not proper third-party claims because they did not involve Goodman's liability to defendants for all or part of Komis's claims against them. Defendants argue that their erroneous designation of Goodman was not an appropriate ground for granting his motion for summary disposition. We agree.

MCR 2.204 governs third-party practice and, in pertinent part, provides, "[A]ny time after commencement of an action, a defending party, as a third-party plaintiff, may serve a summons

and complaint on a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim." MCR 2.204(A)(1). "[T]hird-party complaints are not appropriate when a defendant is not seeking reimbursement for the plaintiff's claim against the defendant, but is seeking to add a 'third party' for another purpose; for example, as an additional defendant to a counterclaim." 2 Longhofer, Michigan Court Rules Practice (7th ed), 2204.2 n 1.

Defendants' claims against Goodman do not stem from his liability for any portion of the claims against defendants. Thus, the trial court correctly concluded that defendants' claims were not properly pleaded third-party claims. Defendants do not appear to dispute this aspect of the trial court's ruling on appeal. Instead, relying on *Prosser v Consumers Power Co*, 456 Mich 906 (1997), they argue that an improper designation of an adversarial party does not warrant dismissal of an action. The Supreme Court's succinct order in *Prosser* said, "As provided by MCR 2.207, the misjoinder of parties is not a ground for the dismissal of an action." *Id*. Defendants' attempt to analogize the case at hand to *Prosser* is unpersuasive because the above quoted sentence is derived directly from the express language of MCR 2.207. MCR 2.204 does not contain a similar rule regarding improper third-party claims. In fact, this Court has previously affirmed summary disposition of a third-party complaint that did not involve the type of derivative liability envisioned by MCR 2.204(A)(1). *Tanielian v Brooks*, 202 Mich App 304; 508 NW2d 189 (1993).

Nonetheless, we agree that summary disposition of defendants' claims was not an appropriate sanction for what was, in essence, a misnomer. Although *Tanielian* offers some support for the trial court's decision, the claim presented by the defendant in *Tanielian* also lacked legal merit. *Id*. at 308. Here, slander of title and tortious interference are both legally cognizable claims, see *Total Quality, Inc v Fewless*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 346409); slip op at 13 (tortious interference), lv pending; *Wells Fargo Bank v Country Place Condo Ass'n*, 304 Mich App 582, 595-596; 848 NW2d 425 (2014) (slander of title), and there has been no suggestion that defendants' complaint was legally insufficient to state these causes of action but for the misnomer.

Summary disposition may be granted under MCR 2.116(C)(8) "when a claim is so clearly unenforceable that no factual development could possibly justify recovery." *El-Khalil*, 504 Mich at 159-160. Courts must look to the substance of a claim over its form and are not bound by procedural labels selected by the parties. *Jawad A Shah, MD, PC v State Farm Mut Auto Ins Co*, 324 Mich App 182, 204; 920 NW2d 148 (2018). Although defendants inaccurately styled their claims against Goodman as third-party claims, the court rules clearly permit additional parties to be joined as defendants to counterclaims. MCR 2.203(G)(1) ("Persons other those made parties to the original action may be made parties to a counterclaim or cross-claim, subject to MCR 2.205 and 2.206."). Defendants asserted the same slander of title and tortious interference claims as counterclaims against Komis, and Goodman should have been designated as a counterdefendant, rather than a third-party defendant. Even so, this misnomer did not render defendants' claims legally unenforceable and, therefore, did not warrant summary disposition under MCR 2.116(C)(8). *El-Khalil*, 504 Mich at 159-160.

B. DEFENDANTS' MOTION FOR SUMMARY DISPOSITION

We now turn to defendants' arguments regarding the merits of their own dispositive motion. Defendants maintain that they were entitled to judgment as a matter of law with respect to both of their claims under MCR 2.116(C)(10).

We review summary disposition rulings de novo. *El-Khalil*, 504 Mich at 159. MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Id*. at 160. "A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) when the affidavits or other documentary evidence, viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and the moving party is therefore entitled to judgment as a matter of law." *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *El-Khalil*, 504 Mich at 160 (quotation marks and citation omitted). "Moreover, a court may not make findings of fact; if the evidence before it is conflicting, summary disposition is improper." *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018) (quotation marks and citation omitted; emphasis omitted).

Defendants' claim of tortious interference requires proof of four elements: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the defendant, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the plaintiff." *Total Quality, Inc*, ___ Mich App at___; slip op at 13. In denying defendants' motion for summary disposition with respect to this claim, the court observed that "most of the matters" underlying defendants' claim were litigated in the Washington case and could not be relitigated in this case. As explained in Part II(A) of this opinion, the record concerning the Washington case was insufficient to support this conclusion.

The court further opined that Goodman was simply attempting to "collect his judgment from a court of competent jurisdiction," which did not support a claim of tortious interference. We infer that the trial court was not satisfied with the third element of defendants' claim, i.e., "an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy." *Id*. To the extent that defendants' claim was premised on Goodman's enforcement of the Washington judgment, the trial court did not err by rejecting Goodman's enforcement measures as a factual basis for tortious interference. As this Court has explained,

> To fulfill the third element, intentional interference inducing or causing a breach of a business relationship, a plaintiff must demonstrate that the defendant acted both intentionally and either improperly or without justification. To establish that a defendant's conduct lacked justification and showed malice, "the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." [*Dalley v Dykema Gossett*, 287 Mich App 296, 323-324; 788 NW2d 679 (2010) (citations omitted).]

-8-

Considering these requirements, acts undertaken in the course of litigation do not constitute improper interference. *Id.* at 324. Goodman had a valid judgment from the Washington case, see *Reed Estate v Reed*, 293 Mich App 168, 180; 810 NW2d 284 (2011) (explaining that a default judgment is absolute and binding unless set aside), and it was properly filed with the Macomb Circuit Court under the Uniform Enforcement of Foreign Judgments Act, MCL 691.1171 *et seq*. Thus, his enforcement of the judgment was not improper or without justification.

However, it appears the trial court did not appreciate the factual basis for defendants' tortious interference claim. Although defendants referenced the Washington lawsuit in their complaint and asserted that Goodman used the resulting judgment to exploit, intimidate, and retaliate against them, they also alleged other actions of tortious interference. For example, defendants asserted that Goodman formed a partnership with Komis to harass Gaetano and her business associates, as demonstrated by their procurement of a false quitclaim deed from Oregon Dank. Defendants further asserted that Goodman and Komis "engaged in unethical and unlawful behavior," and "provided false and defamatory information to public officials," in order to interfere with defendants' business operations and the relationships and expectancies between defendants and their business contacts and customers. Because these allegations do not involve Goodman's enforcement of the Washington judgment, the trial court could not properly reject defendants' tortious interference claim in its entirety as involving lawful measures to enforce the Washington judgment.

Notwithstanding the foregoing, we conclude that the trial court did not err by denying defendants' motion for summary disposition with respect to their tortious interference claim because defendants did not establish entitlement to judgment as a matter of law. Defendants argued before the trial court that Goodman interfered with their business by writing to city officials, attempting to intimidate their public relations consultant, contacting the Internal Revenue Service (IRS) about claims of tax fraud, threatening Gaetano and her family, interfering with their state licensing by lodging fraud complaints with the Bureau of Medical Marihuana Regulation (BMMR), and joining Oregon Dank and Komis in slandering Star-Tek's title to the Gratiot property. Defendants, however, did not demonstrate how any of these actions involve interference with a business relationship or expectancy. For instance, defendants do not explain, and it is difficult to fathom, how Goodman's threatening e-mails to Gaetano and her family, affected defendants' *business*. While the spite and ill will that is evident in the e-mails may be relevant to establishing that Goodman acted with malice, the e-mails do not, themselves, constitute intentional interference inducing or causing breach or termination of a relationship or expectancy as required for a tortious interference claim. *Total Quality, Inc*, ___ Mich App at ___; slip op at 13.

Some of defendants' allegations present more concrete examples of potentially tortious conduct, but the evidence supporting those allegations is not well developed. Defendants produced an e-mail Goodman sent to the BMMR vaguely claiming to have information regarding fraudulent activity. The BMMR responded with a request for additional information, but the record is silent as to the information Goodman provided and what, if anything, the BMMR did in response to Goodman's information. Goodman also sent an e-mail to a city of Detroit councilmember offering to produce negative information about Gaetano, but there is no evidence that the councilmember replied or that any subsequent communications led to breach or termination of a business relation or expectancy. The same is true with respect to the e-mails that defendants' public relations consultant was copied on. Defendants also produced a letter from the IRS asking Goodman for

"assistance in a pending federal tax matter," as well as his response claiming to have "a banker's box of information to provide that will detail millions of dollars of tax evasion by the Gaetanos . . . ." Again, even we accepted the implicit suggestion that Goodman's contact with the IRS triggered an audit, defendants offer no explanation about how the audit interfered with a business relationship or expectancy. Participation in an audit is surely time-consuming and burdensome, but inconvenience does not satisfy the third element of defendants' claim. Likewise, assuming Goodman participated in slandering Star-Tek's title to the Gratiot property, the record lacks evidence or argument about how Goodman's conduct interfered with a business relationship or expectancy.

Defendants' only attempt to link Goodman's conduct to the breach or termination of a business relationship or expectancy is their assertion that their "temporary state license was not renewed" and that "a state license" (presumably a more permanent license) was eventually denied. But the record lacks evidence to support these assertions. While we can fairly presume that defendants are referring to a license required to operate a medical marijuana dispensary, neither their arguments nor the evidence establishes even the most basic details of the licensing issue. To whom was the temporary license issued? When was it revoked? Most importantly, *why* were the licenses revoked or denied? These questions remain unanswered. In other words, a question of fact exists regarding the third element of defendants' tortious interference claim. *Total Quality*, ___ Mich App at ___; slip op at 13. Thus, while the trial court's rationale for denying defendants' motion did not fully support its decision regarding this claim, the court still reached the right result. We will not disturb an order when the correct result is reached for the wrong reason. *Sabbagh v Hamilton Psychological Servs, PLC*, 329 Mich App 324, 345; 941 NW2d 685 (2019).

To prove a slander of title claim, the claimant "must show falsity, malice, and [pecuniary damages or] special damages, i.e., that the defendant maliciously published false statements that disparaged a plaintiff's right in property, causing special damages." *Wells Fargo Bank*, 304 Mich App at 595 (quotation marks and citation omitted; alteration in original). Malice cannot be inferred from the mere act of filing an invalid encumbrance. *Id*. Proof of malice requires evidence that "the defendant knowingly filed an invalid lien with the intent to cause the plaintiff injury." *Id*. (quotation marks and citation omitted).

The trial court indicated that defendants did not present any evidence that Goodman "drafted, negotiated, executed, recorded or was involved with the alleged cloud on the [Gratiot] property." We disagree. Exhibit G to defendants' motion was the letter authored by Goodman in which he claimed to have "assisted Mr. Komis in getting clean title to the building on Gratiot Ave., by brokering a deal among him, I and the [Oregon Dank] people . . . ." Conversely, Goodman also signed an affidavit denying involvement in procuring the quitclaim deed. We recognize the obvious possibility that the claim in Goodman's correspondence might have been nothing more than a spurious, exaggerated, or utterly false boast designed to antagonize Gaetano, with whom he has an indisputably hostile relationship, he cannot avoid the implications of the letter by simply denying his previous statement in a self-serving affidavit. It is not for the trial court to resolve questions of fact in the context of summary disposition, and the conflicting evidence on this point made summary disposition improper. *Patrick*, 322 Mich App at 605. See also *Jewett v Mesick Consol Sch Dist*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 348407); slip op at 7 (explaining that summary disposition should be denied when resolution of a material fact turns on witness credibility), lv pending. Accordingly, even though the trial court's reason for denying

-10-

defendants' motion with respect to their slander of title claim was wrong, it reached the right result because questions of fact remained. *Sabbagh*, 329 Mich App at 345.

## III. DISCOVERY[3]

Next, defendants raise claims of error regarding four discovery issues. As we noted at the outset of this opinion, however, this Court will not generally address a moot issue. *Gleason v Kincaid*, 323 Mich App 308, 314; 917 NW2d 685 (2018). "An issue is moot when a subsequent event makes it impossible for this Court to grant relief." *Id.* Two of defendants' discovery arguments relate to discovery that was relevant only to the claims between defendants and Komis. These claims have been dismissed, so there would be no basis for granting appellate relief at this juncture, even if we agreed with defendants' arguments. We therefore limit our review of these issues to defendants' arguments regarding the order of the parties' depositions and the trial court's resolution of defendants' motion to compel production of documents from Goodman and continuance of his deposition.

We review for an abuse of discretion a trial court's decision regarding discovery motions. *Planet Bingo, LLC v VKGS, LLC*, 319 Mich App 308, 320; 900 NW2d 680 (2017). "A trial court abuses its discretion when it chooses an outcome falling outside the range of reasonable and principled outcomes, or when it makes an error of law." *Id.* (quotation marks and citation omitted). Findings of fact supporting the trial court's decision are reviewed for clear error. *Fette v Peters Const Co*, 310 Mich App 535, 547; 871 NW2d 877 (2015). "Clear error exists when this Court is left with the definite and firm conviction that a mistake was made." *In re Contempt of Henry*, 282 Mich App 656, 669; 765 NW2d 44 (2009).

Defendants challenge the trial court's order dictating that the depositions of defendants—presumably Gaetano, Richard, and defendant Jamine Dickens (the individual defendants)—were to be taken before Komis was deposed. According to defendants, the trial court's ruling effectively precluded them from deposing Komis because Komis did not show interest in deposing the individual defendants. Defendants' position grossly misconstrues the record with respect to this issue. After the court entered the subject order, the individual defendants' depositions were delayed while they sought protective orders regarding their rights against self-incrimination. Several months later, Komis filed an emergency motion to compel the individual defendants' depositions after Richard did not appear for his scheduled deposition, purportedly because Komis had not amended his complaint to clarify which claims were asserted against each named defendant and because there was a continued disagreement among the attorneys regarding the individual defendants' ability to assert a Fifth Amendment privilege. When Richard's deposition finally took place in August, 2018, it was prematurely terminated by opposing counsel because of Richard's allegedly aggressive behavior and continued use of profane and vulgar language. Regardless of the merits of the parties' respective positions regarding the depositions or any fault that might be

---

[3] Many of the rules governing discovery in Chapter 2.300 of the court rules were amended in June 2019, with the amendments taking effect January 1, 2020. See 504 Mich xxviii-lviii (2019). All references to the court rules in the analysis of these issues refer to the previous version, which was in effect at the time of the trial court's challenged rulings.

attributed for the delays, it is evident that Komis did in fact pursue the individual defendants' depositions.

At any rate, although discovery matters are generally left to the parties' determination, MCR 2.302(D) permits a trial court to dictate the sequence of discovery. The discovery process in this case was highly contentious. The parties' attorneys had great difficulty working together cordially and continuously filed motion after motion regarding participation in discovery and compliance with court orders. Under these circumstances, it was not outside the range of reasonable outcomes for the trial court to order the depositions to proceed in a particular order. Moreover, the court's order regarding the depositions did not merely dictate the order of the depositions, it also provided that the individual defendants *and* Komis were obligated to make themselves available for depositions within 45 days. Although the parties failed to satisfy this requirement, the court's order was clearly designed to reduce the need for continued discovery motions while still enabling defendants to depose Komis in a reasonable time frame. The order involved a sound exercise of the trial court's discretion.

Defendants also challenge the trial court's decision to reverse its order compelling Goodman to produce documents and attend a continued deposition. After Goodman's deposition, defendants asked the trial court to compel Goodman to produce documents referenced at his deposition. The trial court initially granted defendants' motion but, on reconsideration, determined that its initial order was improvidently granted and declined to order production of any documents or continuation of Goodman's deposition.

The court's order addressed the documents defendants sought in five categories. The first category was confidential agreements with federal and state agencies, including the IRS. The court reasoned that the evidence need not be produced because it was irrelevant and "not within the jurisdiction of this court to order to be disclosed." The trial court's reasoning about its authority to compel disclosure of the confidentiality agreements rested on an erroneous legal foundation. MCR 2.302(B)(1) permits "discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . ." Although confidentiality is often a component of recognized privileges, it is not an independent privilege that can be asserted to thwart appropriate discovery in legal proceedings. If mere "confidentiality," as determined by contracting parties, was sufficient to avoid discovery of an agreement or information subject to such an agreement, a shrewd actor could shield nearly all of his or her activities and transactions from discovery by way of private confidentiality agreements. This result would be at odds with the fact-finding goal of discovery. See *Swain v Morse*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 346850); slip op at 9 ("A primary purpose of discovery is to enhance the reliability of the fact-finding process by eliminating distortion attributable to gamesmanship.") (quotation marks and citation omitted), lv pending. Of course, confidentiality agreements are not without value; like any other contract, they are generally binding on the parties to the agreement, which substantially reduces the potential of harmful disclosures made for improper purposes. But when confidential material is relevant to the issues involved in a lawsuit and is not otherwise privileged, it is generally subject to discovery. The circumstances may call for disclosure pursuant to a protective order to prevent further dissemination of the confidential material, but to conclude that confidential material is undiscoverable is inconsistent with discovery practices in this state.

-12-

Nonetheless, the trial court reasonably declined to compel production of Goodman's confidentiality agreements with state and federal agencies in this case. Discovery is available only for "any matter, not privileged, which is relevant to the subject matter involved in the pending action," MCR 2.302(B)(1), and it is difficult to imagine how a confidentiality agreement (as opposed to information or documents subject to the agreement) could have any bearing on defendants' tortious interference or slander of title claims. We recognize that defendants contend Goodman's actions caused revocation or denial of their licensing. Assuming defendants had a legitimate expectation with respect to its licensing that could support its tortious interference claim—a matter that has yet to be explored by the parties or trial court—Goodman did not interfere with that expectation by agreeing to keep information or documents he shared with governmental agencies confidential. The confidentiality agreements were therefore irrelevant to the subject matters that remained pending in this case.

With respect to the second category of documents, "[e]-mails, correspondence, [and] memorandums between Goodman, Komis, or Beydoun [sic]," the court again declined to compel production because it related to matters subject to confidentiality agreements and because the material was not relevant. The trial court abused its discretion in this regard. Again, the confidential nature of otherwise discoverable information does not prohibit a court from compelling production of relevant evidence. Nor can this category fairly be characterized as irrelevant. Defendants' claims against Goodman are largely premised on allegations that he acted in concert with Komis and Baydoun to slander the title to the Gratiot property and interfere with defendants' business relations and expectancies. While the communications between Goodman, Komis, and Baydoun may not ultimately support defendants' claims, they are clearly relevant to proving or negating material issues. The trial court's refusal to compel production of these documents was outside the range of reasonable outcomes.

The third category of documents involved "[c]urrent related business and confidentiality agreements," which the court likewise determined were irrelevant, not reasonably calculated to lead to the discovery of admissible evidence, and subject to confidentiality agreements. As already explained, the confidentiality of such documents was not dispositive of whether the documents could be compelled in discovery. The limited deposition excerpts submitted to the trial court suggest that the documents defendants sought concerned Goodman's ownership interests in other businesses.[4] There has been no suggestion that Goodman's involvement in other, unrelated businesses interfered with defendants' business expectancies or relationships or helped to facilitate the improper cloud on Star-Tek's title to the Gratiot property. The trial court's ruling with respect to this category was not an abuse of discretion.

The fourth category in the court's ruling involved documents that would establish that Richard or Gaetano are "criminals." The court refused to compel production of these documents because the information was readily available to defendants. Goodman testified that he could

---

[4] We are aware that Goodman's entire deposition transcript was submitted as an exhibit to defendants' appellate brief. But only limited excerpts were provided to the trial court, and the pages produced for the first time on appeal are not property before this Court. *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56; 649 NW2d 783 (2002).

acquire proof of Richard's and Gaetano's criminality because there were public records available in Washington and Oregon, further noting that defense counsel could easily make a public records request on his own. To the extent that Goodman did not have possession, custody, or control of the public records at issue, the trial court did not abuse its discretion by failing to compel production. See MCR 2.310(B)(1)(a) (permitting a party to request production or inspection of documents or tangible things "that are in the possession, custody, or control of the party on whom the request is served").

The fifth category of documents includes "[b]ackground check reports, proof of concealment of money from creditors, incriminating documents and a list of auction purchases," and was denied by the trial court for lack of relevance. We agree with the trial court's assessment. Goodman testified that Richard had a lengthy history of criminal convictions, which Goodman discovered after he performed a background check using a legal research platform to which he no longer had access. Even if Goodman still had possession of or access to the background check report, Richard's criminal history is not relevant to defendants' claims. The remaining items related to matters that occurred during Goodman's former representation of Gaetano and Richard and were likewise entirely unrelated to the claims at issue in this case. The trial court did not abuse its discretion by refusing to compel irrelevant material.

Lastly, the trial court determined that there was no further need to continue Goodman's deposition. Defendants asked the court to compel Goodman to appear, apparently for the purpose of questioning him about the documents that were the subject of their motion to compel. For the foregoing reasons, only the communications between Goodman, Komis, and Baydoun were actually subject to discovery. The limited documents to which defendants were entitled, yet were unable to review before or during Goodman's deposition, substantially decreases defendants' need to continue deposing him. If defendants still believe a continued deposition is necessary after these documents are produced and reviewed, they should be permitted to revisit this question on remand.

## IV. CONTEMPT PROCEEDINGS

Next, defendants argue that the trial court unfairly punished Gaetano for criminal contempt without minimum due process protections.[5] We agree.

---

[5] We note that the unusual circumstances that occurred in the trial court arguably render this issue moot, at least as an independent claim of error. When a trial court fails to comply with the procedures mandated for contempt proceedings, the appropriate remedy is to reverse the contempt finding and vacate the accused's sentence. *In re Contempt of Auto Club Ins Ass'n*, 243 Mich App 697, 716-717; 624 NW2d 443 (2000). The trial court stated on the record that Gaetano was "in contempt," but did not find Gaetano in contempt in a written order or judgment. "[A] court speaks through its written orders and judgments, not through its oral pronouncements." *In re Contempt of Henry*, 282 Mich App at 678. As such, Gaetano was not formally held in contempt, and there is nothing to reverse or vacate. Defendants do not identify any further relief that could or should be granted with respect to this specific claim of error. Even so, resolution of this issue is

-14-

We review contempt orders for an abuse of discretion. *Porter v Porter*, 285 Mich App 450, 454; 776 NW2d 377 (2009). "The abuse of discretion standard recognizes that there will be circumstances where there is no single correct outcome and which require [this Court] to defer to the trial court's judgment; reversal is warranted only when the trial court's decision is outside the range of principled outcomes." *Id*. at 455. "A trial court necessarily abuses its discretion when it makes an error of law." *Powers v Brown*, 328 Mich App 617, 620; 939 NW2d 733 (2019). "Moreover, a trial court's factual findings are reviewed for clear error and questions of law are reviewed de novo." *Porter*, 285 Mich App at 454-455. "Clear error exists when this Court is left with the definite and firm conviction that a mistake was made." *In re Contempt of Henry*, 282 Mich App at 669.

The parties appeared before the court on April 17, 2018, to address several motions. Before the hearing concluded, the court was advised that the appointed financial expert in this case was concerned about a photograph of himself taken by Gaetano in the courthouse hallway. The court placed Gaetano under oath and questioned her about the incident. Gaetano admitted that she used her cellphone to take a picture of the expert when she saw him discussing the case with Komis in the hallway. Gaetano explained that she thought the interaction was inappropriate and wanted to show the photograph to her attorney when the hearing was over, but the court was skeptical of her explanation, opining that her true purpose for photographing English was to intimidate him. Although Gaetano denied any such intention, she eventually admitted that she sent the photograph to an employee and was unable to offer a rational explanation for doing so. After further interrogation, the court said, "She's in contempt." Defense counsel argued that a separate hearing was required, and the proceedings adjourned for reasons that are unclear from the record. During the break, Gaetano was handcuffed and taken to "a detention facility in the courthouse," where she was strip searched and placed in a cell.

When the hearing resumed approximately 30 minutes later, the court ensured that the photograph was deleted. Defense counsel asked that the record be clarified to reflect that Gaetano "was held in temporary confinement but was not held in criminal contempt," and the court agreed that Gaetano "was held in temporary confinement pending the conclusion of the hearing, because the Court needed [an] immediate break for natural reasons." However, the court also indicated that Gaetano's contempt "was criminal by dint of the immediate hearing," but adjudication was held "in abeyance pending cooperation." Defense counsel began to raise an objection, but the court interrupted to say, "I think you're right. I'm going to let that serve as a warning but any subsequent behavior can be considered on top of what was done." Although the trial court did enter an order about what occurred, the order did not find Gaetano in contempt, and the issue was not pursued further.

Contempt of court is broadly characterized as "a willful act, omission, or statement that tends to impair the authority or impede the functioning of a court." *In re Contempt of Robertson*, 209 Mich App 433, 436; 531 NW2d 763 (1995). Whether contempt is deemed civil or criminal depends on the court's purpose for exercising its contempt power. *In re Contempt of Auto Club*

---

appropriate in this instance despite our inability to grant relief concerning this issue alone because it bears on defendants' right to relief concerning judicial disqualification.

-15-

*Ins Ass'n*, 243 Mich App 697, 711; 624 NW2d 443 (2000). In the context of criminal contempt, the court's goal is to "punish past disobedient conduct by imposing an unconditional and definite sentence." *DeGeorge v Warheit*, 276 Mich App 587, 592; 741 NW2d 384 (2007). The sanction imposed is punitive. *Id*. at 591. Although sanctions imposed for civil contempt "may also have a punitive effective, the sanctions are primarily coercive" and designed to compel compliance with a court order. *Id*. at 592.

The distinction between civil and criminal contempt is critical because due process demands more procedural safeguards in criminal contempt proceedings than civil contempt proceedings. *Porter*, 285 Mich App at 456-457. Those safeguards include a presumption of innocence, the right against self-incrimination, and the contempt must be proven beyond a reasonable doubt. *Id*. The accused must be "informed not only whether the contempt proceedings are civil or criminal, but also the specific offenses with which he or she is charged." *DeGeorge*, 276 Mich App at 592. Additionally, "the accused in a contempt proceeding is entitled to be given time to prepare a defense, secure the assistance of counsel, and produce witnesses on his or her behalf." *Id*. at 593.

The process required for contempt proceedings is also dictated by the type of contempt at issue. Indirect contempt occurs "outside the court's direct view." *In re Contempt of Auto Club Ins Ass'n*, 243 Mich App at 712. When contempt is indirect, the court must "follow the procedures established in MCR 3.606 and afford some measure of due process before the court can determine whether there is sufficient evidence of contempt to warrant sanctions." *Id*. at 713. However, "[i]f the contemptuous behavior occurs in front of the court, i.e., it is 'direct' contempt, there is no need for a separate hearing before the court imposes any proper sanctions because 'all facts necessary to a finding of contempt are within the personal knowledge of the judge.' " *Id*. at 712 (citation omitted). See also MCL 600.1711(1) ("When any contempt is committed in the immediate view and presence of the court, the court may punish it summarily by fine, or imprisonment, or both."). This is true even in the context of direct, criminal contempt, *In re Contempt of Auto Club Ins Ass'n*, 243 Mich App at 714, as long as the sanction imposed is not a "serious criminal penalty" involving imprisonment for more than six months, *Int'l Union, United Mine Workers of America v Bagwell*, 512 US 821, 826-827, 833; 114 S Ct 2552; 129 L Ed 2d 642 (1994).

The contempt at issue in this case is properly characterized as criminal contempt because the trial court was punishing Gaetano for conduct that had already occurred. *DeGeorge*, 276 Mich App at 591-592. The contemptuous conduct at issue was Gaetano's act of photographing the expert in the hallway. Where the trial court did not personally witness this event, it is characterized as indirect contempt. *In re Contempt of Auto Club Ins Ass'n*, 243 Mich App at 712.

Gaetano was not afforded several of the procedural protections required for indirect criminal contempt proceedings. She was not, for instance, informed whether the proceedings were civil or criminal or allowed to produce witnesses. And although her attorneys were present throughout the proceedings, she was not given an opportunity to consult with them or advised of her right against self-incrimination before she admitted photographing the expert. Many of the procedural safeguards required in criminal contempt proceedings involve protections that must be provided when the alleged contempt is adjudicated, and the allegations against Gaetano did not *technically* reach that stage. Instead, the trial court simply stated on the record that Gaetano was in contempt, placed her in custody during a 30-minute recess in the proceedings, then resolved the

-16-

matter without formally finding her in contempt. Imprisonment is typically an appropriate sanction for contempt, *Porter*, 285 Mich App at 456, but we are unaware of any authority for imposing a sanction under the circumstances of this case—that is, *before* a court properly determines that the accused committed the underlying contempt.[6] To allow a court to put the cart before the horse in this manner would have the undesirable effect of rendering due process safeguards meaningless, as a court could always avoid complying with due process requirements by detaining individuals on an informal basis. Consequently, we agree with defendants that the trial court abused its discretion by placing Gaetano in custody, even if only for a brief break in the proceedings.

We note that in responding to a motion for disqualification defendants filed soon after this incident, the trial court cited MCR 8.115 as authority for its conduct. The trial court's summary of the rule was generally accurate, but we disagree with the significance the court attached to it. At the time of the contempt hearing, MCR 8.115(C)(2) provided that "no photographs may be taken of any jurors or witnesses," and that failure to comply with the rule "may result in a fine, including confiscation of the device, incarceration, or both for contempt of court."[7] This rule provides authority for finding and punishing contempt on the basis of the specific act at issue in this case, but it does not authorize the summary procedure the trial court employed. Michigan courts have a long history of strictly enforcing the "immediate view and presence" requirement for direct contempt proceedings, and "constructive presence" will not suffice. *In re Collins*, 329 Mich 192, 196; 45 NW2d 31 (1950), quoting *In re Wood*, 82 Mich 75; 45 NW 1113 (1890).

## V. JUDICIAL DISQUALIFICATION

Lastly, defendants argue that both the presiding judge and the chief judge of the trial court erred by denying defendants' motion for disqualification. We agree.

When called upon to review a motion for disqualification, we review the trial court's factual findings for an abuse of discretion, but application of the facts to the law is reviewed de novo. *Kern v Kern-Koskela*, 320 Mich App 212, 231; 905 NW2d 453 (2017), citing *In re MKK*, 286 Mich App 546, 564; 781 NW2d 132 (2009). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Kern*, 320 Mich App at 231, quoting *In re MKK*, 286 Mich App at 564.

MCR 2.003 governs judicial qualifications, with Subrule (C)(1) providing a nonexclusive list of circumstances in which disqualification is warranted, including when

---

[6] When contempt proceedings are initiated by ex parte motion under MCR 3.606(A) for indirect contempt, the court may "issue a bench warrant for the arrest of the person." MCR 3.606(A)(1). This authority, however, seems to presuppose that the accused needs to be located and brought to court to answer the allegations. There is simply no need for a preadjudication arrest when, as was the case here, the accused is already voluntarily appearing before the court.

[7] The rule has since been amended, effective May 1, 2020.

(a) The judge is biased or prejudiced for or against a party or attorney.

(b) The judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey*, [556 US 868]; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct. [MCR 2.003(C)(1)(a) and (b) (alteration in original).]

Although these standards are often discussed together when addressing issues of judicial disqualification, it is important to recognize that there are separate, distinct considerations at issue in each of these provisions. MCR 2.003(C)(1)(a) concerns judicial bias and prejudice and only requires disqualification upon a showing of *actual* bias or prejudice. See *Cain v Dep't of Corrections*, 451 Mich 470, 497; 548 NW2d 210 (1996) (regarding predecessor to rule, former MCR 2.003(B)(1)). MCR 2.003(C)(1)(b) involves two alternatives. The first incorporates the standards articulated in *Caperton*, which apply only to extreme and extraordinary situations of a level not at issue in this case. *Caperton*, 566 US at 886-887. The second alternative in MCR 2.003(C)(1)(b) incorporates the "appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct," and requires disqualification when a judge fails to adhere to that standard. "Under MCR 2.003(C)(1)(b), the test for determining whether there is an appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." *Kern*, 320 Mich App at 232 (quotation marks and citation omitted). The plain language of MCR 2.003(C)(1)(b) states that the inquiry applicable to this standard must be "based on objective and reasonable perceptions." Consequently, a judge's subjective assessment of his or her own actual bias is not controlling. It is this second alternative under MCR 2.003(C)(1)(b) that we find relevant in this case.

By the end of the April 17, 2018 hearing, the presiding judge seemed to recognize the procedural errors that occurred at the hearing and abandoned the issue of contempt. The simple fact that the error occurred is not the type of conduct that would call a judge's integrity, impartiality, and competence into question. After all, "it must be remembered that trial judges are human and they do make mistakes." *Cain*, 451 Mich at 516. "[T]he remedy for mistakes made by trial judges lies in the appellate process, not in motions to disqualify." *Id*. at 516-517. Defendants argue, however, that the contempt issue gave rise to what "can only be described as a cover up." Defendants' direct this Court's attention to the order the presiding judge entered after the hearing, which contained the following sentence: "The court held a hearing as to the taking, production and elimination of a photograph of the financial expert taken by defendant in the hallway (presence) of the court." Defendants maintain that the parenthetical insertion of the word "presence" in this statement was a patently false and material misrepresentation included to justify the wrongful conduct of the presiding judge.

To begin with, we agree that the suggestion of the presiding judge, that Gaetano's allegedly contemptuous conduct occurred in his presence, is clearly false. Gaetano took the photograph in the hallway while court was in session. In most circumstances, the inclusion of a single inaccurate word or statement would not signal any impropriety. Minor errors in written orders can occur as a result of inadvertence, clerical errors, failure of memory, etc. But the unique circumstances of

-18-

this particular error have deeper implications. Whether an act of contempt was witnessed by the presiding judge has legal significance because direct contempt may be summarily punished. MCL 600.1711(1); *In re Contempt of Auto Club Ins Ass'n*, 243 Mich App at 712-714. Thus, if Gaetano had photographed the expert in the presence of the presiding judge, his decision to temporarily handcuff her and place her "in custody" would likely have been justified.

Under these circumstances, it is difficult to reasonably infer an innocent cause for the erroneous inclusion of the "presence" parenthetical, and the presiding judge did not offer one below. Instead, he reiterated the facts that led to the contempt hearing, described the hearing itself, and stated that Gaetano's act of photographing the expert was a violation of MCR 8.115 punishable by incarceration for contempt. The presiding judge also observed that the expert was extremely shaken by the incident, and reasoned that the safety of witnesses cannot be jeopardized without compromising the integrity of the entire judiciary, concluding, "I will not stand for it." We share the concerns of the presiding judge for witness safety and judicial integrity, but his explanation does not help to explain how or why the odd parenthetical was included in the order or what implications can be objectively and reasonably drawn from it.

But for the parenthetical, the sentence was factually accurate. Its inclusion not only negated this accuracy, it also made the statement rather ambiguous. Does it imply that the presiding judge was "in the hallway" when the event occurred? That the hallway was somehow visible from the presiding judge's vantage point in the court room? Or did the presiding judge mean to suggest that *any* conduct that occurs within the courthouse occurs "in the presence" of the presiding judge? Contra *In re Collins*, 329 Mich at 196. We cannot imagine a legitimate practical purpose for the parenthetical. To the contrary, it simply muddied the already convoluted record regarding the April 17, 2018 hearing. And in light of the legal significance of "presence" in contempt proceedings—particularly the defective proceedings in this case—it would defy logic to presume that the parenthetical was somehow included by mistake or inadvertence. The natural implication is that the presiding judge intentionally included the misleading parenthetical in a misguided attempt to justify his mistake. Even if the presiding judge did not, subjectively, craft the language of the order for that purpose, an objective and reasonable person would likely agree with defendants' position in the absence of any other plausible explanation.

It would be naïve to believe that minor misstatements or misleading representations are uncommon in litigation. Litigants have an obvious self-interest in prevailing that raises implicit questions of credibility. Witnesses may have biases that tempt them to offer skewed testimony. Tangible evidence can be tampered with. The litigation process is an imperfect one, but there are countless procedural and evidentiary rules in place designed to promote ascertainment of the truth. When it objectively appears that a judge charged with enforcing these rules gives in to the temptation to put his or her own self-interests above maintaining a fair and record it places the judge's integrity into question.

Moreover, it is noteworthy that there were other troubling portions of the hearing that do not directly involve the contempt issue. Before he was asked to intervene regarding the photograph, the presiding judge mentioned in passing that he was aware of inappropriate comments made by defendants, and admonished defense counsel, saying: "[I]t's inappropriate for the clients to talk to the Court like that. . . . And if I get anymore of that, it's going to be a problem for your clients." When defense counsel inquired about the comment, the presiding judge said,

-19-

"I'll tell you later." According to defendants, the presiding judge was referring to the fact that the expert reported Gaetano saying, "F*** the Judge," during a private conversation. Beyond defendants' assertion in their motion for disqualification, there is nothing else in the record that confirms or refutes the nature of the comment. Even if this was not the comment the presiding judge was referencing, the fact remains that he was clearly displeased by an extrajudicial statement.

During his subsequent questioning of Gaetano, the presiding judge raised the issue again:

> *The Court*: I think you don't think boundaries apply to you.
>
> *Ms. Gaetano*: Okay.
>
> *The Court*: Do you want me to have a hearing on what you told [the expert] to tell me?
>
> *Ms. Gaetano*: No, sir.
>
> *The Court*: Glad to have it. You know what happens to people that use that type of language and convey that kind of information to a state public elected official?
>
> *Ms. Gaetano*: No, sir.
>
> *The Court*: It's a crime. It's a federal crime. Would you like to get into that and have a hearing?
>
> *Ms. Gaetano*: No, sir.

Gaetano's out-of-court statement had nothing to do with the matter before the Court. By interjecting this issue in the midst of the procedurally defective contempt hearing, the presiding judge created additional grounds for objective scrutiny of his motives during the hearing that could give rise to concerns about his ability to preside over the case impartially.

We are mindful of the deference we must afford a trial judge's findings regarding a motion for disqualification. But the presiding judge's response to defendants' complaint regarding the contempt proceeding adds more fuel to the fire. Although the presiding judge appeared to recognize that the contempt proceedings did not comport with the required procedure midway through the hearing, when the parties convened for defendants' motion for disqualification, the presiding judge unequivocally rejected the notion that any error had occurred and asserted that his actions were authorized by MCR 8.115. As explained earlier, this Court rule permits a court to punish violations of the prohibition against photographing witnesses with incarceration for contempt, but it does not speak to the procedure the court must follow to do so. Only direct contempt can be summarily adjudicated in the manner that occurred here, and Gaetano's contempt was indirect because she photographed the expert outside the direct presence of the presiding judge. MCL 600.1711(1); *In re Contempt of Auto Club Ins Ass'n*, 243 Mich App at 712. While this Court will not ordinarily attach negative inferences to judicial errors, the totality of the circumstances at play in this case turn the presiding judge's erroneous insistence that his conduct was permissible under MCR 8.115 into a double-edged sword. On the one hand, if the presiding

judge's misplaced reliance on MCR 8.115 was honest and well-intended, there could be concerns about his competence to accurately apply the court rules in this case. On the other hand, if this Court views it as a further attempt to cover up a known error, it only underscores the possibility that he allowed his own interests to interfere with his judgment.

Either way, even though any one of the errors that occurred with respect to the contempt proceedings would not establish sufficient grounds for disqualification under MCR 2.003(C)(1)(b), we believe that the errors collectively created an appearance of impropriety because a reasonable objective person would believe that the presiding judge's ability to carry out his judicial responsibilities with integrity, impartiality, and competence was impaired in this case. *Kern*, 320 Mich App at 232. To be clear, we do not suggest that the presiding judge was biased toward defendants or intentionally treated them unfairly. In fact, we find defendants' alternative arguments regarding the presiding judge's alleged bias unpersuasive. But for the appearance of impropriety arising from the contempt proceedings, the record as a whole suggests that the presiding judge did his best to exercise control over a difficult dispute that was highly contentious, not only between the parties, but also their respective attorneys. Nonetheless, potential disqualification under MCR 3.002(C)(1)(b)(ii) on the basis of an appearance of impropriety involves an objective inquiry, and a reasonable perception of the foregoing events requires the presiding judge's disqualification.

## VI. CONCLUSION

We reverse the trial court's summary disposition order as it relates to the trial court's grant of summary disposition in favor of Goodman, but affirm the denial of defendants' motion for summary disposition and remand for further proceedings. We also vacate the trial court's orders regarding defendants' motion to compel production of documents from Goodman and continuance of his deposition, and remand with instructions to permit discovery consistent with this opinion. We reverse the orders denying defendants' motion for disqualification of the presiding judge in this matter. On remand, this case should be remanded to a new judge for further proceedings. We do not retain jurisdiction.

/s/ Kathleen Jansen
/s/ Cynthia Diane Stephens